IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ESTATE OF MICHAEL OSTBY, et al., | CV 17-124-BLG-SPW-TJC |
| Plaintiffs, | |
| | **FINDINGS AND** |
| vs. | **RECOMMENDATION OF** |
| | **U.S. MAGISTRATE JUDGE** |
| YELLOWSTONE COUNTY, | |
| Defendant. | |

Plaintiffs, the Estate of Michael Ostby, by and through court appointed personal representatives, and Nicole Hale, Joe Ostby, and Cassandra Ostby, individually, (collectively, "Plaintiffs"), bring this action against Yellowstone County for negligence and civil rights violations after the decedent, Michael Ostby, committed suicide while being held as a pretrial detainee at the Yellowstone County Detention Facility ("YCDF").

Presently before the Court are the County's Motion for Partial Judgment on the Pleadings (Doc. 84), and Plaintiff's Motion for Partial Summary Judgment (Doc. 90). The motions have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B), and are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court **RECOMMENDS** the County's Motion for Partial Judgment on the Pleadings be **GRANTED** in part, and

1

**DENIED** in part, and Plaintiff's Motion for Partial Summary Judgment be
**DENIED**.[1]

## I.     THE COUNTY'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A.     Procedural Background

On May 7, 2015, Michael Ostby ("Ostby") was arrested and detained at
YCDF.  On July 1, 2015, Ostby died by suicide while incarcerated.  Ostby hanged
himself by a tying a torn bedsheet through a broken clothing hook in his cell.

On June 30, 2017, Plaintiffs filed a complaint in state court against
Yellowstone County, Billings Clinic, Terry Jessee (a former employee of
Billings Clinic), and RiverStone Health.  (Doc. 1-2.)  The case was removed
to this Court on September 21, 2017.  (Doc. 1.)  Thereafter, the County filed
cross-claims and third-party complaints against Billings Clinic and
RiverStone.  (Docs. 3, 4, 7.)  Eventually, Plaintiffs settled with RiverStone,
Billings Clinic and Terry Jessee, and the Court dismissed the County's third-

---

[1] Plaintiffs have filed a Motion for Hearing regarding the Motion for Partial
Summary Judgment.  (Doc. 113.)  The Court finds this matter is appropriate for
disposition without oral argument.  Accordingly, Plaintiffs' motion is **DENIED**.
Further, the County's Motion to Strike the Supplemental Memorandum filed by
Plaintiffs on December 10, 2019 (Doc. 115) is **GRANTED**, and Plaintiffs' Motion
for Leave to File the Supplemental Memorandum (Doc. 116) is **DENIED**.  The
Court does not find the information presented in the Supplemental Memorandum
relevant, and did not consider it in deciding Plaintiffs' Motion for Partial Summary
Judgment.

party complaints against RiverStone and Billings Clinic.  (Docs. 5-1 at 7, 10, 69.)

On July 5, 2018, Plaintiffs filed a First Amended Complaint.  (Doc. 51.)  The complaint included a claim against the County for negligence and a civil rights claim under 42 U.S.C. § 1983.  The County moved for partial judgment on the pleadings as to Plaintiffs' 42 U.S.C. § 1983 claim; the Court granted the motion with leave to amend.  (Doc. 81.)

Thereafter, Plaintiffs filed a Second Amended Complaint, re-alleging that the County was negligent in failing to provide adequate medical and psychiatric care for Ostby at YCDF.  (Doc. 82)  Plaintiffs also re-allege the County's liability under § 1983.  (*Id.*)

The County now moves for partial judgment on the pleadings as to Plaintiffs' § 1983 claim.  (Doc. 84.)

## B. Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Fed.R.Civ.P. 12(c).  A Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  *Cafasso, United States ex rel. v. General Dynamics*

*C4 Systems, Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).  Thus, the same legal standard "applies to motions brought under either rule."  *Id.*

"Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).  The Court's standard of review under Rule 12(b)(6) is informed by Rule 8(a)(2), which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  While "detailed factual allegations" are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations and citations omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

4

plausible on its face.'" *Id.* at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  A plausibility determination is context specific, and courts must draw on judicial experience and common sense in evaluating a complaint.  *Levitt v. Yelp! Inc.*, 2014 WL 4290615, *10 (9th Cir. 2014).

> ### C.     Analysis

In the Second Amended Complaint, Plaintiffs re-assert a claim under 42 U.S.C. § 1983 against the County for violation of Michael Ostby's right to adequate medical and psychiatric care under the Fourteenth Amendment.  (Doc. 82 at ¶¶ 116-137.)  The County again moves for judgment on the pleadings on grounds that Plaintiffs have failed to allege a viable *Monell* claim.  Specifically, the County asserts Plaintiffs have failed to adequately specify how a policy or custom of the County violated Ostby's rights.

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute ... custom, or usage of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction of [the United States] to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  Municipal entities, such as the County, are considered "persons" under § 1983 and may be sued for causing a constitutional

deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). But a county "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under §1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis in original). Rather, liability only attaches where "the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002).

Therefore, to impose municipal liability under Section 1983 for a violation of constitutional rights, a plaintiff must show: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).

A policy may be one of action or inaction. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's failure to implement procedural

safeguards to prevent constitutional violations." *Id.* To establish liability for a policy of inaction, the plaintiff must show that the policy constitutes deliberate indifference. *Id.* The plaintiff must also show that the constitutional violation could have been prevented with an appropriate policy. *Id.*

The deliberate indifference standard is an objective inquiry. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). A plaintiff must establish that the "facts available to city policy makers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitution rights of their citizens. . . ." *City of Canton*, 489 U.S. at 396.

To satisfy the "moving force" requirement, "the identified deficiency in the policy must be closely related to the ultimate injury. The plaintiff's burden is to establish that the injury would have been avoided had proper policies been implemented." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (internal citations and quotations omitted).

In the Second Amended Complaint, Plaintiffs identify the following policies of the County that allegedly violated Ostby's constitutional rights: the medical request forms/kite system; the classification policy; and the suicide prevention policy. Plaintiffs also allege that the County failed to provide adequate suicide prevention training. At this stage in litigation, the Court finds Plaintiffs allege

sufficient facts to support their *Monell* claim with regard to the medical request forms/kite system, classification policy, and suicide protocol.[2]

Plaintiffs first sufficiently allege that the County had policies in place to process medical requests, to classify and place inmates within the facility, and for suicide prevention.  (Doc. 82 at ¶ 128.)  The County also acknowledges that it had policies in place for these purposes.  (Doc. 85 at 10-21.)

Plaintiffs further allege that these policies were deficient.  With respect to the medical request/kite policy, Plaintiffs allege the policy was deficient because it did not provide for verification that medical or psychiatric care was provided in response to the request.  In short, Plaintiffs allege that the medical request policy did not result in inmates, including Ostby, actually receiving necessary medical and mental health care.  (Doc. 82 at ¶ 128 a.)

---

[2] The Court notes however, that to the extent Plaintiffs allege the suicide protocol was deficient because the County's existing suicide prevention policy was not followed, Plaintiffs fail to state a claim under *Monell*.  *Monell* liability cannot be based on the failure of an individual or individuals to follow an existing policy. *See e.g. Ritter v. Marshowski*, 2016 WL 8735667, *3 (D. Nev. March 4, 2016) ("An allegation that the individual defendants failed to follow the municipality's policies and procedures resulted in the constitutional violation negates municipal liability under *Monell* as the individual defendant's actions, and not municipal policies, would have caused the constitutional violation."); *Zachary v. City of Newburgh*, 2014 WL 1508705, *5 (S.D.N.Y. April 2, 2014) (explaining that an alleged failure to follow police policy "is the antithesis of a *Monell* claim").

As to the classification system, Plaintiffs allege the policy was deficient because it did not adequately consider mental health issues and suicide risk in classifying inmates and placing them within the facility.  Plaintiffs allege the policy resulted in Osbty's inappropriate placement in an isolation cell without adequate safeguards for suicide prevention.  (*Id.* at ¶ 128 d-g.)

Finally, Plaintiffs allege that the suicide policy was deficient because it did not provide for the placement of inmates on suicide watch when appropriate to do so.  (*Id.* at ¶ 128 h.)  Plaintiffs allege that after Ostby was found with torn bed sheets and a shank just days prior to his suicide, he was not place on suicide watch. Plaintiffs further allege that the policy was deficient because it did not incorporate and implement the recommendations in the Montana Strategic Suicide Prevention Plan developed by the Montana Association of Counties.  (*Id.* at ¶ 128 i.)

Plaintiffs further allege that the deficiencies in the policies constituted deliberate indifference; that is, the County had actual and/or constructive notice that these deficiencies would result in deliberate indifference to inmates necessary medical and mental health needs and increase the risk of suicide in its facility.  In support of this allegation, Plaintiffs state that the County was aware that two other inmates at the detention facility had previously committed suicide by hanging themselves with clothing or bedsheets.  (*Id.* at ¶ 71.)  Plaintiffs further allege that the "National Study of Jail Suicide – 20 years Later" had been published in 2010,

9

which provided the County notice that suicide was the leading cause of death in jails in the country; suicide by hanging with bedding was the most common method used; the majority of suicides occur when inmates are in isolation; and anchoring hooks in a cell provide the most common means for suicide by hanging. (*Id.* at ¶ 75.)  Additionally, Plaintiffs allege that the suicide prevention study by the Montana Association of Counties recommended the use of anti-suicide blankets and clothing, timely access to mental health care, removal of clothing hooks, and advised of the increased risk of suicide when placed in isolation.  (*Id.* at ¶ 77.)

Finally, Plaintiffs allege that the deficient policies were causally related to Ostby's suicide, and that his death would have been prevented had proper policies been implemented.  (*Id.* at ¶¶ 122 a, 128 b, e, i, and 129.)  Thus, Plaintiffs have sufficiently alleged that the policies were a moving force behind the alleged constitutional deprivations.

Therefore, Plaintiffs identify the challenged policies, explain how the policies are deficient and amount to deliberate indifferent, and allege the causal relationship between the policy and the constitutional violation.  The Court finds that the Second Amended Complaint sufficiently alleges a plausible *Monell* claim against the County with respect to County policies for medical requests/kites, classification, and suicide prevention.

10

Plaintiffs' allegations concerning failure to train, however, are insufficient to state a *Monell* claim. The Supreme Court has noted that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). The Court has thus recognized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Therefore, to assert a *Monell* claim for failure to train, a plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality" and "allege facts to show the [municipality] 'disregarded the known or obvious consequences that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights.'" *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) (internal citations omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62.

Here, Plaintiffs generally allege that the County "made the intentional decision not to have an adequately trained workforce." (Doc. 82 at ¶ 122 e.) But this is the kind of conclusory allegation, unsupported by any factual allegations, a

court need not accept as true.  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")

Plaintiffs also specifically allege, however, that Officers Toland and Anderson, who were assigned to Classification A at the time of Ostby's death, had not received any suicide prevention or mental health training.  (Doc. 82 at ¶¶ 89, 122, 125, 128.)  But "evidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).  Plaintiffs have not alleged a program-wide inadequacy in training.  In fact, Plaintiffs have alleged that Officers Toland and Anderson had not received suicide prevention or mental health training "despite the County providing such training to other officers."  (Doc. 82 at ¶ 125.)  This allegation suggests that, unlike Toland and Anderson, other officers had been trained in mental health and suicide prevention.  Therefore, any shortfall in Officers Toland and Anderson's training "can only by classified as negligence on the part of the municipal defendant – a much lower standard of fault than deliberate indifference."  *Id.* at 485.

Further, although Plaintiffs have alleged that other inmates at YCDF died by suicide or attempted suicide by using clothing and sheets in 2013, Plaintiffs have not alleged that the employees involved in those instances were similarly

untrained.  In short, Plaintiffs have not alleged a pattern of constitutional violations by YCDF employees resulting in other suicides, which would have provided the County with actual or constructive notice that it was deliberately indifferent in maintaining its training policies.  Nor have Plaintiffs alleged a failure to train claim that falls within the "narrow range of circumstances" supporting single-incident liability.  *Connick*, 563 U.S. at 63-64.  The Supreme Court has recognized that in "rare" circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Id.* at 64.  That is not the case here.

Accordingly, the Court finds Plaintiffs have stated a viable §1983 claim against the County with regard to the policy theory, but not as to the training theory.  The Court therefore recommends that Plaintiffs' Motion for Partial Judgment on the Pleadings be granted with respect to Plaintiffs' failure to train claim, and denied in all other respects.

## II.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.    Factual Background[3]

On May 7, 2015, Ostby was arrested by the Billings Police Department and transported to YCDF.  During his arrest, Ostby had been involved in an altercation

---

[3] The background facts set forth here are relevant to the Court's determination of the pending motion and are taken from the parties' submissions and are undisputed unless otherwise indicated.

with the police, referred to as an attempted "suicide by cop."  When Ostby arrived,

he was placed in a holding cell in Booking for observation.  Within an hour of

being placed in the holding cell, Ostby attempted to hang himself with his shirt.

Staff intervened and implemented a suicide prevention protocol.

The next morning, on May 8, 2015, Terry Jessee of Billings Clinic evaluated

Ostby and determined he was no longer suicidal, and advised YCDF staff that they

could end the suicide prevention protocol.  Later that day, around 11:30 a.m.,

Ostby got into a confrontation with other inmates in the North 2 dayroom.  Ostby

was ordered to return to his cell.  An officer then observed Ostby remove his shirt

and attempt to hang himself on the toilet in his cell.  When the officer entered the

cell to intervene, Ostby assaulted him.  Ostby was restrained, and the suicide

prevention protocol was again implemented.  Ostby remained on the protocol until

the morning of May 11, 2015.

On May 11, 2015, Jessee spoke with Ostby and Ostby stated he would not

harm himself.  Jessee indicated Ostby could be moved to a housing unit, but

cautioned "Continue to monitor for changes in mood/behavior.  Move with

caution.  IM's behavior has been rash and unpredictable."  Thereafter, Ostby was

placed in administrative segregation in "Classification A" as punishment for

assaulting the officer.  Ostby remained in Classification A until the time of his

death.

Over the course of the next several weeks, Ostby submitted four requests for medical care, six requests for mental health care, two requests for drug court, and three requests to be moved out of Classification A.  YCDF staff received, reviewed and distributed the requests to the appropriate recipients.  The County asserts Billings Clinic and/or RiverStone were responsible for the responses to the medical and mental health requests.  It is undisputed that RiverStone never saw Ostby in response to his medical requests, and Billings Clinic only saw him once in response to his mental health requests.

On May 19, 2015, Ostby submitted a medical request seeking care for "depression/anxiety."  In response, Ostby was asked "What are your symptoms? Please be specific."  On May 21, 2015, Ostby submitted a request, stating "depression, bi-polar . . . I cry four hours on end with feelings of worthlessness, hopelessness, anger, sadness, voices in my head talk shit to me tell me I'm no good, anxiety, scared, super down, feel like the world is closing in on me, paranoid, feel like everything is against me or out to get me and hurt me."  On May 27, 2015, Ostby made another mental health request, repeating that he was crying "for hours on end, feeling helpless, worthless, sad, angry, anxiety like my chest is in a vice.  Voices in my held talk shit to me all the time, tell me things, paranoid, feel like the world is closing in on me, feel like everyone is against me or out to get

15

me."  On May 27 and June 2, 2015, Ostby's medical requests were responded to with the notation "scheduled to see [Mental Health]."

On May 27, 2015, Ostby submitted a medical request regarding back problems.  He stated he felt "like I'm being ripped in half.  Sharp shooting pains in lower back down through legs.  My back problems are getting worse."  He explained he was supposed to have his spine fused and had "blown out" disks.  He also stated he was experiencing "burning through my shoulder blades to my fingers . . . and my arms are going numb more and more every day."  In response, Ostby was told he could "get Ibuprofen and Tylenol from canteen."  That same day, Ostby submitted another request saying his toes on his right foot were "turning purple . . . and feel like there is a bunch of pressure in them like they are going to explode."  Ostby was advised to "show medical during med pass."

On May 31, 2015, Ostby submitted a medical request stating, "I need to see mental health ASAP."  He reported "the voices in my head are seriously messing with me.  I'm seeing stuff that isn't there, shadow people, bugs, ghosts, can't sleep more than [illegible] 4 hours a day.  Super paranoid.  I just toss and turn and lay there freaking out."  The response to the request stated Ostby was "scheduled to see [Mental Health]."

On June 2, 2015, Ostby submitted a request stating "I would like to sign the proper DNR paperwork and no blood transfusions.  As I have requested to see

mental health for 2 weeks now, I give up and if anything happens to me it's on this facility." The response stated "You're scheduled to be seen by [Mental Health]." The County states that when staff received this request, they interpreted it as an indication Ostby might be suicidal and contacted Billings Clinic. A notation in the Inmate Activity Log from that date states "Terry Jessee notified and all shift supervisors notified. Per Terry keep a close eye on I/M Ostby. If he exhibits any kind of suicidal behavior, I/M is to [be] placed in a suicide suit in booking."

On June 4, 2015, Jessee evaluated Ostby. Ostby reported he was "having a hard time being locked down (Class A)" and "has a lot of voices in my head" that are "making fun of me." He reported "seeing weird stuff" such as bugs on the floor that were not really there and a "black cloud coming in and out of the wall." Ostby told Jessee he "cries a lot" and described symptoms of anxiety. Ostby also acknowledged heavy drug use, including daily use of methamphetamine, heroin, pain killers, and THC. Jessee noted that he observed Ostby as "edgy, pressured, anxious, startles easily at loud noises (like doors slamming), teary eyed at times during contact." Jessee stated that Ostby "denies current SI/HI, and CONTRACTS FOR SAFETY." Jessee assessed Ostby with "probable major depression, moderate to severe, chronic; anxiety NOS; possible substance-induced psychosis; chronic, long-term polysubstance abuse. Possible personality disorder." Jessee

recommended "Continue to monitor.  Refer to psychiatry."  However, Jessee did not see Ostby again, and he was not seen by the psychiatrist.

On June 9, 2015, Ostby submitted a medical request stating he was "hoping to see the provider soon about my back and possibly getting some meds . . . my back is getting worse."  He also requested an extra mat.  The response stated "Extra mat denied.  We do not fix chronic issues.  You need to do some gentle stretching and walking."  The response also noted that he was "told in a kite that you were scheduled to see Mental Health (MH)."

On June 12, 2015, Ostby submitted another request for mental health.  He stated "I need to see Mental Health again a.s.a.p.  I got some pretty messed up stuff going on in my head.  I'm serious."  The response noted "Scheduled to see [Mental Health]."  Ostby was not seen by mental health.

On June 23, 2015, Ostby submitted a medical request seeking medical care. He stated his "[a]rms go numb from shoulder blades to fingers and burning, feel like I'm being ripped in half, shooting pains down legs.  I was told 4 weeks ago that I would be able to see the doctor for my back and still have not.  It is getting worse it hurts to walk, lay, sit."  Ostby further stated "Do I need my parents to contact the ACLU or their attorney before I get seen or what?  Allergic to Tylenol . . . I need to see a Doctor Please."  The response to the request stated "I cannot find any kite from you requesting to see a provider, only requesting to see mental

health.  As you have already been told, we cannot fix your back here, or any

chronic problems.  You will be scheduled to see a provider, to be assessed for

comfort.  Be aware that we will not respond to threats."  Ostby was not seen by a

provider.

On June 28, 2015, during a cell inspection, staff found torn bed sheets and a

shank in Ostby's cell.  The discovery of the torn sheets was not shared with Jessee,

and Ostby was not removed from his cell or placed under the suicide prevention

protocol.  Jessee later testified that if had been advised about the torn bed sheets,

he would have had Ostby moved to a holding cell for observation immediately.

The County disputes that torn bed sheets are an indication that an inmate is

suicidal.  Undersheriff Sam Bofto testified in his official capacity that torn bed

sheets could be used for several things, including being used as a means of suicide

or a means of "fishing" for things outside the cells.

On July 1, 2015, Ostby hung himself with torn bed sheets that had been tied

to a broken clothing hook in his cell.  Plaintiffs contend the clothing hook was

defective and had it been in working order, it would have been suicide resistant.

Plaintiffs assert the hook should have been removed, replaced or repaired.

Plaintiffs also point out that Jesse testified he did not know about the broken hook

in Ostby's cell; but if he had, he would have taken steps to have Ostby removed

from the cell.  The County does not dispute that the hook should have been

19

removed or replaced, but asserts there is no evidence it was more or less susceptible for use as an instrument for suicide in its broken state. The County also disputes Jessee's testimony, and asserts he had visited Ostby in his cell on June 4, 2015, and therefore knew the condition of his cell.

Jessee further testified that days before Ostby's suicide, he warned YCDF staff that Ostby should not be in a cell alone. Jessee stated he was concerned Ostby's mental state might deteriorate if he was kept in isolation without a cellmate. The County disputes this. The County asserts there is no documentation Jessee requested Ostby be given a cellmate. The County further points out that the staff members Jessee allegedly warned were not on duty at the time Jessee claims he spoke to them.

Plaintiffs assert other detainees in Classification A also warned YCDF staff of Ostby's risk of suicide. Lester McFerran testified that he was worried about Ostby's mental health and talked to several detention officers about it. Daniel Belmarez also testified that he felt Ostby was suicidal and depressed, and he talked to numerous officers and one sergeant about his concerns. The County disputes this testimony, and states there are no records or reports that McFerran, Belmarez or any other inmate ever reported Ostby may be suicidal.

Other inmates, and not YCDF staff, initially observed Ostby hanged in his cell. They summoned help from the guards. Plaintiffs assert the inmates attempted

20

to get the guards' attention for 45 minutes, contrary to YCDF policy which required inmates to be observed at 30-minute intervals.  Plaintiffs assert that Ostby had not been observed in his cell for over 83 minutes when he died.  When Ostby was found, he showed signs of rigor and livor mortis, indicating he had been dead for over an hour to 90 minutes.  YCDF does not dispute that staff did not follow the policy with the frequency of their checks, and missed at least two mandatory inspections of Ostby.  But the County disputes whether the inmates attempted to get the guards attention for 45 minutes, and asserts staff were in Ostby's cell within minutes of the request for assistance.

The parties also dispute whether the Officers Toland and Anderson were trained in suicide prevention.  Plaintiffs assert they had not received training on inmate suicide prevention or mental health, and that Officer Toland had not been through the Montana Law Enforcement Academy.  The County asserts it trains staff internally at YCDF, that Officer Toland testified he was aware of the County's suicide prevention protocol, and that there is no requirement that staff complete the Academy before starting work as guards.

## B.    Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute

as to a material fact is genuine if there is sufficient evidence for a reasonable fact-

finder to return a verdict for the nonmoving party.  *Id.*  "Disputes over irrelevant

or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec.*

*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

    The party seeking summary judgment always bears the initial burden of

establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

323.  If the moving party meets its initial responsibility, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually

does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  In attempting to establish the existence of this factual dispute, the

opposing party must "go beyond the pleadings and by 'the depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)).  The opposing party cannot defeat summary judgment merely by

demonstrating "that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216,

1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of

the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at

252).

When making this determination, the Court must view all inferences drawn

from the underlying facts in the light most favorable to the non-moving party. *See*

*Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of

evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, [when] he [or she] is ruling on a motion for

summary judgment." *Anderson*, 477 U.S. at 255.

### C. Analysis

Plaintiffs move for partial summary judgment in their favor on the

negligence claim against the County.  Plaintiffs maintain that summary judgment is

appropriate on the issue of whether the County breached its duty to Osby, leaving

the issues of causation and damages for trial.  The County opposes, arguing there

are genuine issues of material fact as to whether the County breached its duty of

care to Ostby.

Negligence requires proof of a legal duty, breach of that duty, causation and

damages. *Krieg v. Massey*, 781 P.2d 277, 278-79 (Mont. 1989.)  "Negligence

actions usually involve questions of fact regarding breach of duty and causation; as

a result, they are not ordinarily susceptible to summary judgment and are usually

better resolved at trial." *Craig v. Schell*, 975 P.2d 820, 822 (Mont. 1999).  In some

circumstances, the Court can determine breach and causation, but "only where reasonable minds could reach but one conclusion." *Id.*

Plaintiffs contend that summary judgment is appropriate here. Plaintiffs argue the County had a non-delegable duty to provide Ostby medical and mental health care, and that based on the undisputed evidence, the County breached its duty. In addition, Plaintiffs point out that the County affirmatively alleged in its cross claim and third-party claim that Billings Clinic and Riverstone Health failed to provide adequate mental health and medical care to Ostby. (*See* Docs. 3, 4.) Plaintiffs allege "these admissions conclusively establish the Defendant's liability to Ostby. (Doc. 91 at 9.)

Plaintiffs are correct that the County owed a duty to Ostby "to keep him safe and to protect him from unnecessary harm." *Pretty on Top v. City of Hardin*, 597 P.2d 58, 60 (Mont. 1979). As the Montana Supreme Court has recognized "Reasonable and Ordinary care must be exercised for the life and health of the prisoner." *Id.* In accordance with this authority, the County has acknowledged that it has a non-delegable duty to provide adequate medical care to inmates in its detention facility. (Doc. 103 at ¶ 5.)

Nevertheless, this general duty of care does not necessarily impose a duty to prevent an inmate's intentional conduct, including suicide. "Generally, a party cannot recover in negligence for the suicide of another 'since the act of suicide is

considered a deliberate intervening act exonerating the defendant from legal responsibility.'"  *Gourneau v. Hamill*, 311 P.3d 760, 763 (Mont. 2013).  But a duty to prevent suicide may exist under certain special circumstances, such as in a custodial setting where the suicide is foreseeable.  *Pretty on Top*, 597 P.2d at 61-62; *Gourneau*, 311 P.3d at 763.  Special circumstances giving rise to such a duty may exist where the jailer "knew or should have known that the prisoner was suicidal."  *Pretty on Top*, 597 P.2d at 61.  Where such special circumstances exist, "a duty arises to provide reasonable care necessary to prevent the prisoner from committing suicide."  *Id.* at 61-62.

Plaintiffs assert the undisputed facts show the County knew of Ostby's risk of suicide but did nothing.  Plaintiffs point to the fact Ostby was involved in an attempted "suicide by cop" incident when he was arrested; he made two attempts at suicide while in custody; he made multiple requests for medical and mental health care to no avail; he asked to sign "do not resuscitate" paperwork and warned that "if anything happens to me its on this facility"; torn bed sheets were found in his cell days before his suicide; and the County failed to heed warnings from other inmates and the on-site mental health counselor about Ostby.

The County contends, however, that there are disputed issues of material fact as to what inferences should be drawn from Ostby's behaviors prior to his suicide, and whether the County was on notice that he was suicidal and should have taken

actions to prevent his suicide.  The County points out that Ostby's prior suicide

attempts occurred 54 and 55 days before he successfully committed suicide, and on

both occasions the suicide prevention protocol was implemented.  The County

states the facility delivered Ostby's medical requests to the appropriate providers,

and when Ostby requested the "DNR," staff immediately contacted Billings Clinic.

Ostby also denied that he intended to harm himself when interviewed by Jessee

following his suicide attempts in May, and also denied suicidal ideation when

interviewed in June following his DNR request.  The County also points out that

Jessee did not advise staff to implement the suicide prevention protocol after he

evaluated Ostby.  The County also disputes that Jesssee advised the County that

Ostby should not be left alone, and also disputes that any inmate or Billings Clinic

staff advised that they had concerns about Ostby's mental health.  The County

further asserts YCDF staff was not concerned about finding torn bed sheets in

Ostby's cell because of their use for things unrelated to suicide

      The Court finds the County has raised a genuine issue of fact as to whether it

was reasonably foreseeable that Ostby would attempt to harm himself.  "The jury

in a negligence action is tasked with deciding whether the risk in question – [the

decedent's] despair and resulting suicide – was forseeable to the defendants."

*Newman v. Lichfield*, 272 P.3d 635, 631 (Mont. 2012).  While a jury certainly

could conclude that the County could have foreseen the risk of Ostby's suicide,

"that determination is for the jury to make only after it hears all the relevant evidence." *Id.* at 632.  Moreover, even assuming a duty arose to provide reasonable care to prevent Ostby's suicide, the breach of that duty is a question of fact to be resolved by a jury. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1177 (Mont. 2014).  Construing the facts in the light most favorable to the County, the Court does not find "reasonable minds could reach but one conclusion" in this case. *Craig*, 975 P.2d at 822.

Accordingly, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment be denied.

## III.   CONCLUSION

Therefore, based on the foregoing, **IT IS RECOMMENDED** that:

1.     The County's Motion for Partial Judgment on the Pleadings (Doc. 84) be **GRANTED** with respect to the Plaintiffs' failure to train claim, and be **DENIED** in all other respects; and

2.     Plaintiffs' Motion for Partial Summary Judgment (Doc. 90) be **DENIED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

27

served on opposing counsel within fourteen (14) days after service hereof, or

objection is waived.

**IT IS ORDERED**.

DATED this 13th day of January, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge